## BRADY v. SOUTH SHORE TRACTION CO.

### In re BRADY et al.

(District Court, E. D. New York.   May 20, 1916.)

RAILROADS ☞84—CONTRACTS—DEPOSIT TO SECURE PERFORMANCE—FORFEI-
TURES—WAIVER.
 The city of New York *held* without right to insist on a forfeiture of
$30,000 worth of bonds deposited with the city comptroller by a traction
company to secure performance of a contract by which it was to build a
railroad in the borough of Queens within a specified time, because of non-
action by officers of the city, by which the work was delayed, and also
because of the execution of a substituted contract, after the time had
expired, by which the original contract was annulled; and the receivers
for the traction company *held* entitled to recover the interest accrued on
the bonds.
 [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 222; Dec. Dig.
☞84.]

In Equity.   Suit by Paul T. Brady against the South Shore Traction
Company.   In the matter of the application of Paul T. Brady and Wil-
lard V. King, receivers, for an order directing the payment of accumu-
lated interest by the city of New York.   On exceptions by the city to
report of master.   Exceptions overruled, and order granted.

Arthur C. Hume, of New York City, for receivers.

Lamar Hardy, Corp. Counsel, of New York City (Samuel J. Rosen-
sohn and Vincent Victory, both of New York City, of counsel), for
city of New York.

Breed, Abbott & Morgan, of New York City, for Northern Bank of
New York.

CHATFIELD, District Judge.   The city of New York has in its
possession certain corporate stock of the city, which was deposited
by the South Shore Traction Company under the provisions of section
4, paragraph 17, of a contract entered into May 20, 1909, between the
South Shore Traction Company and the city of New York.   Certain
interest has accrued upon that corporate stock, and the receivers of the
South Shore Traction Company, for the benefit of those claimants
entitled to the interest, if it be properly obtained by the receivers, have
undertaken to litigate with the city the right to the particular moneys
made up of these interest items.

 It appears that similar questions will arise with respect to other
items of the same sort, and with respect to the principal of these
bonds, and that the determination of the questions in this instance
will be of some effect in establishing the rights of the receivers to
the other funds; but the existence of collateral claims to the principal
of the bonds does not render it impossible at the present time to deter-
mine the issues which arise between the receivers and the city as to
the particular items representing interest already due.

 The issues were referred to a master to hear the testimony and
report his opinion thereupon.   The report of the master as finally pre-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sented makes certain findings in the form of conclusions, both of fact and law, but has not specifically presented the various findings of fact and conclusions of law which in a matter of this sort might have been set forth consecutively and separately. If so divided and stated, they would present to this court merely the question whether they were supported by the record, in so far as they determined questions of fact, and whether the conclusions of law were correct.

The city has filed exceptions to the report of the master, in the form of assignments of error as to the statements taken as if they were specific findings, and also as assignments of error to the admission of testimony received as conclusive, or the exclusion of testimony offered to rebut the allegations urged by the petitioners.

In view of the facts that the reference was to hear and report, and that the findings made by the master stand as facts unless unsupported by the testimony, it does not seem necessary to go into the various specific grounds of objection nor the various specific matters which are presented as findings in the report.

The issue is based upon many details and allegations of fact, covering a considerable period during which the company for which the receivers were appointed was operating a railroad over the so-called Blackwell's Island Bridge into the borough of Queens, and contemplating the construction of a road from the terminal of that bridge in Long Island City through the village of Jamaica in Queens county. The proposed railroad, after crossing the bridge and leaving the bridge structure, was to cross what is known as the "Bridge Plaza" and Jackson avenue and was then to be carried over the Sunnyside Yards, and by an embankment of some 20 feet in height gradually down to the street level at the intersection of the new diagonal street with Thomson avenue.

Thomson avenue ultimately joins with Hoffman boulevard, and thus carried the route to the intersection of Pierson street, which is in the former village of Jamaica, and through the village of Jamaica from Pierson street to the intersection of the Merrick plank road and Central avenue. An uncertain route was originally contemplated, because of plans to change the Long Island Railroad station, and as early as September 12, 1907, the South Shore Traction Company filed a petition with the board of estimate and apportionment to be granted the right to construct a double track surface railroad, upon the route substantially described, to the boundaries of Nassau county. On April 13, 1908, an amended petition, to include the route over the Queensboro Bridge, was substituted, and upon December 28, 1908, a further application was made, so as to eliminate difficulties arising from the plans of the Long Island Railroad beyond Jamaica, and so as to avoid certain streets upon which the construction of street surface railway was prohibited by law.

As far east as the intersection of Hoffman Boulevard and Pierson street, the route was the same as in the earliest petition mentioned, and the object of the construction was to build a railway by which passengers could reach the new Jamaica station of the Long Island road. This station had not yet been located in the village of Jamaica,

and the granting of a franchise to the South Shore Traction Company, together with suggestions as to the proposed form of contract, was recommended by the engineer in charge, who stated that the preliminary procedure should be completed, so that the contract would be in shape for final passage as soon as possible after traffic arrangements over the Queensboro Bridge were disposed of.

This contract was approved upon the 26th of February, 1909, but on April 2, 1909, and upon recommendation of the corporation counsel, a new paragraph, numbered 17, was inserted in section 4, by which it was provided that within three months after the signing of this contract, and before anything was done in exercise of the rights thereunder, the South Shore Traction Company should deposit with the comptroller of the city $30,000,

"which said further sum shall be returned to the company upon condition that the company shall have completed the construction of a double track surface railway *from Jackson avenue* at the Queensboro Plaza and *the intersection of Hoffman Boulevard with Pierson street*, and put the same in operation within 18 months from the date upon which the consents of the property owners are obtained for the lawful construction of *such* railway * * * or from the date upon which the decision of the Appellate Division of the Supreme Court * * * is rendered," etc.

For the purpose of facilitating the work, it was consented by this section that the company might construct temporary overhead crossings on Thomson avenue within the lines of said avenue. It was further provided that upon proper certificate the comptroller was to return to the company the said sum of $30,000. Unless this certificate was delivered, and the statement accepted by the board of estimate as correct, or proven by the company to be correct, "then such sum of $30,000 shall be forfeited to and become the property of the city." If, at any time prior to the time specified for the completion and operation, any other right to construct a street surface railroad upon all or any portions of said line be granted to another corporation, then the whole $30,000 was to be returned to the South Shore Traction Company. On February 20, 1910, consents for Thomson avenue and the short connecting or diagonal street to the bridge approach were obtained, and upon October 20, 1910, the Appellate Division of the Supreme Court granted a certificate as to Hoffman Boulevard.

The city contends that at the expiration of 18 months from the latter date, which would be April 20, 1912, the city was entitled to hold the $30,000 as forfeited and as the property of the city. It appears according to the record that the station of the Long Island Railroad in Jamaica was not definitely located until long after the expiration of the 18 months in question, and so far as the extension of the road from Pierson street in Jamaica, on to the Nassau county line, we need consider nothing further than that no plans were filed or approved and no road built until long after the period in question.

As to the connection between the bridge plaza and Diagonal street, and approval of permanent plans for the railroad through Thomson avenue and Hoffman Boulevard, it appears from the record that all through the period in question the city officials intended to lay out what was to be known as the Queens Boulevard. This roadway would

necessitate a relaying and probably relocation of the tracks of the railway company, and, if these tracks were in an inconvenient or impossible place, might furnish an insuperable obstacle to the approval of plans for the Queens Boulevard itself.

Paragraph 17 was based upon the proposition that from the intersection of Pierson street and Hoffman Boulevard the road could not be built, and that from the bridge plaza along Thomson avenue it could only be constructed temporarily. With full knowledge that the report recommended that the contract run for a period of 25 years and contained provisions for complete returns to the city and payments for each year during the life of the contract, with a cash payment at the end of 3 months after signing the contract, that in the case of a violation or breach and declaration of forfeiture the property of the railroad might become the property of the city, and that actual construction should start within 6 months and be completed within 2 years, with the possibility of 6 months' extension after the obtaining of consents or order of the Appellate Division (which consents were to be obtained within a maximum of 9 months, or with 1 month to apply to the Appellate Division), nevertheless the road was given by paragraph 17 but 18 months after the signing of the contract to designate routes for the construction (and at the suggestion of the corporation counsel of New York they agreed to deposit a further sum of $30,000 to complete the construction) of a double track railroad from Jackson avenue at the bridge plaza and the intersection of Hoffman Boulevard with Pierson street (which was the place of beginning for the extension, which has never yet been built). Where this section was to terminate, or what "such railway" meant, was not stated, and was always in dispute.

It is admitted upon the record that none of the road was built within 18 months after the above-recited consents and order of the Appellate Division were obtained, but it was built within 2 years, as modified by the contract of October 29, 1912, which declared the old agreements and contracts *null and void*. It appears that the only application for a permit to build the road from the bridge on into Thomson avenue and Hoffman Boulevard was filed with a deputy commissioner of public works in the borough of Queens, and that his authority to pass upon this application is now repudiated by the city. The city alleges that the company purposely avoided applying for a permit to such officers as the city considers were authorized to approve plans for the railroad construction.

It appears from the record and from the master's report that in so far as the city officials (who might have been expected to have interested themselves in the construction and operation of means of transportation upon these streets) were concerned the plans for the improvement of those streets were definitely allowed to remain incomplete, and to be marked that tracks were "to end here until further application, subject to early action by the board of estimate and apportionment on the proposed Queens Boulevard or otherwise."

The special master has reported that the railroad was relieved from carrying out the provisions of the earlier contract by failure upon

the part of the city officials to furnish any approval of plans or to promulgate and complete, by the action of the board, of estimate, any definite street map over the route in question.

The city has objected to the receipt of evidence upon any of these questions, and has insisted that the literal interpretation of the rescinded contract, and the expiration (without the completion of whatever part of the railroad was required by the particular provisions of section 17) of 18 months from October 20, 1910, make it necessary to hold that the $30,000 in question and all rights thereto had been forfeited. But this contract shows upon its face such ambiguities and discrepancies that it is impossible to exclude oral testimony, or to hold that a waiver of forfeiture could not be had by the acts of the officials in question, independent of any written modification of the contract.

The seventeenth clause (on which this action is based) as has been already said, was drawn to require the completion of a railroad running *from* two widely separated points, each of which by the other provisions of the entire contract was at a point where the ultimate location of the railroad was entirely indefinite, and this section provides that the railway is to be put in operation within 18 months after the consents for "such railway" are obtained.

As has been stated, this clause 17 seems to be impossible of reconcilement with the other general provisions of the contract, as to rental, etc. The report accompanying the proposed contract states definitely that Thomson avenue and Hoffman Boulevard, while extensively used at that time, were to be made a wide boulevard at some future date. The city officials seem to have immediately undertaken plans for the construction of this boulevard, and the general provisions of the contract, which required construction of the balance of the road within 6 months after the time within which the sections beginning at the bridge plaza and beginning at the intersection of Hoffman Boulevard and Pierson street were to be completed (whatever those sections might be), include the portions of the road which have not yet been built, as to which the city seems to have waived damages for the nominal breach of contract, and as to which the new contract entirely rescinds and makes void the old contract.

The special master has reported generally this situation. He has found specifically that the city officials, generally, considered the immediate carrying of passengers and the transportation of the public as of less importance than the completion of their plans for the so-called Queens Boulevard. The board of estimate and apportionment and some of the officials representing it seem to have kept in mind the possibility of obtaining a forfeiture of the $30,000 in question, and therefore carefully sought to avoid granting to the South Shore Traction Company relief by an admission that the forfeiture had not occurred. But neither the attitude of the city authorities in seeking to hold the $30,000, nor to now justify the indifference of all those concerned, can do away with the substantial impossibility of performance caused by the city, and which is shown by the record, in so far as the railroad was to be given the use of such streets as were to be accepted

in accordance with the terms of the contract. When the old contract was rescinded the following paragraph was inserted in the new:

"The sum of thirty thousand dollars ($30,000) provided for in this paragraph is to be in addition to any sum already deposited by the company with the comptroller of the city of New York under the provisions of paragraph seventeenth of the contract of May 20, 1909, the respective rights of the city and of the company in the sum so deposited under said contract being left for future adjustment through judicial proceedings or otherwise."

But no forfeiture was thereby agreed to or saved by the city from the waiver caused by making void the original contract and by the substitution of an extension of the original conditions.

If we assume that section 17 was intended to provide that a separate railway (between the bridge plaza at the *west end* and the intersection of Hoffman Boulevard and Pierson street at the *east end*) was contemplated, and that this section was to be completed within 18 months, and if we attempt to construe the provision that the board of estimate shall immediately verify the correctness, accept the statement as correct, or return it if they consider it incorrect, and if it is thereafter proven to be correct, that then the board shall refund the $30,000 and the further provision that, unless such a certificate is delivered and ultimately proven to be correct, the $30,000 shall be forfeited, it is evident that the conduct of every one concerned was such that no strict interpretation was acted upon or even considered to exist, and the forfeiture of the $30,000 was treated, not as the imposition of a penalty, but rather as security, if the city incurred damages from a breach of the contract, in whatever form it might ultimately be carried out. This would be the plain effect of the clause inserted in the new contract, if anything was accomplished thereby.

There is some evidence that the city was compelled to expend a certain amount in repaving Diagonal street, but that this could be considered damages is not even substantiated, as the entire contract shows that the city planned to either have the road built and the streets constructed in one form, and then have these streets torn up and rebuild them in another form when the city was ready to build the Queens Boulevard, or that the city did not anticipate actual construction of the railroad until such time as suited the city's convenience.

Upon all the evidence it would seem that the city suffered no damage whatever, and it cannot be held that the inconvenience of the public, due to lack of harmonious decision and to delay on the part of the city officials, can be treated as a basis for pecuniary damages, nor as a ground for enforcing a forfeiture of an agreement based upon strict and prompt action by the city on its part. The failure of the city authorities to live up to what was in the mind of one official and of the corporation counsel, in attempting to draw a contract for the city, is a sufficient basis for a finding that impossibility of performance was effectuated, and that this is a complete defense to strict enforcement of the penalty.

There is abundant evidence in this case that a waiver, after the expiration of the 18 months, was furnished by the action of the city authorities, and that the subsequent attempt to restore the city to a

position where it might insist upon literal compliance with the present interpretation (by the city) of the contract and to literal enforcement of the forfeiture, would be contrary to law and would certainly violate the principles of equity from which the right of the receiver's claim is to be tested, when the claims of the receiver to property submitted to the jurisdiction of this court are concerned.

The report will be confirmed, and the receiver may have a decree allowing his claim.

---

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes